## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **TIMOTHY VINCENT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:07-CV-28** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Timothy Vincent appeals to the District Court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1]  (*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Vincent applied for DIB on September 20, 2002, alleging that he became disabled as of October 3, 2001.  (Tr. 91-93.)  The Commissioner denied his application initially and upon reconsideration.  (Tr. 35-36, 69-71, 73-76.)  On August 10, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Vincent, who was represented by counsel,Vincent's wife, and a vocational expert ("VE") testified.  (Tr. 390-420.)  On October 15, 2004, the ALJ rendered an unfavorable decision to Vincent.  (Tr. 48-57.)  Vincent submitted a timely request for review to the Appeals Council, and the Appeals Council remanded the case for another hearing before the ALJ.  (Tr. 37-39.)  Another ALJ, the Honorable John Pope, conducted the second hearing on February 28, 2006, with the same counsel and witnesses.  (Tr. 421-57.)

---

[1]All parties have consented to the Magistrate Judge.  *See* 28 U.S.C. § 636(c).

The ALJ issued an unfavorable decision to Vincent, (Tr. 12-26), and the Appeals Council denied Vincent's subsequent request for review, (Tr. 3-11), making the ALJ's second decision the final decision of the Commissioner.

Vincent filed a complaint with this Court on February 21, 2007, seeking relief from the Commissioner's final decision.  (Docket # 1.)  He argues that the ALJ improperly evaluated the opinion of his treating physician, Dr. Tatara, as well as the credibility of his symptom testimony. (Opening Br. in Soc. Sec. Appeal ("Opening Br.") 16, 21.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

Vincent was forty-eight years old at the time of the ALJ's decision after the second hearing.  (Tr. 91.)  He had a high school education and worked for over twenty-five years as a driver in auto transport.  (Tr. 101, 106, 130, 138.)  He alleged fibromyalgia, osteoarthritis, depression, and lumbago[3] in his Disability Report, (Tr. 100), and then also included in his Opening Brief degenerative disk disease of the lumbar spine, lumbar spinal stenosis, morbid obesity, hypertension, cognitive disorder (NOS), and iatrogenic constipation, (Opening Br. 2).

### B. Summary of Relevant Medical Evidence

### Dr. Mark Tatara from October 1990 to February 23, 2006

Vincent began seeing Mark Tatara, M.D., in October 1990, (Tr. 379), for various ailments.  Vincent visited Dr. Tatara frequently during the period of alleged disability various

---

[2] The administrative record in this case is voluminous (457 pages), and the parties' disputes involve only small portions of it, that is, the ALJ's evaluation of the opinion of Vincent's treating physician, and his finding that Vincent's symptom testimony was not credible.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[3] Lumbago is defined as "[p]ain in mid and lower back[,] a descriptive term not specifying cause." STEDMAN'S MEDICAL DICTIONARY 1121 (28th ed. 2006).

complaints, seeing him at least three times in 2001, (Tr. 280-82), over a dozen times in 2002,
(Tr. 265-79), approximately nine times in 2003, (Tr. 261-64, 337-44), about nine or ten times in
each 2004 and 2005 (Tr. 327-36, 360-75), and twice at the start of 2006, (Tr. 354-59).

Dr. Tatara completed a Residual Functional Capacity Questionnaire on June 15, 2004.
(Tr. 318-22.)  He noted that Vincent's prognosis was poor and that he meets the American
College of Rheumatology criteria for fibromyalgia and has impairments of lumbar spinal
stenosis and degenerative disk disease.  (Tr. 318.)  Dr. Tatara identified Vincent's symptoms
(including multiple tender points, non-restorative sleep, chronic fatigue), (Tr. 318), and stated
that obesity contributes to the severity of Vincent's symptoms and functional limitations, (Tr.
319).

Dr. Tatara also noted that Vincent has "constant, severe" bilateral pain in his legs and
lumbrosacral, cervical, and thoracic spine; that movement, overuse, and static position
precipitate the pain; and that his symptoms constantly interfere with his attention and
concentration.  (Tr. 319.)  Nonetheless, he reported that Vincent is capable of high stress work.
(Tr. 320.)  Dr. Tatara found that Vincent could sit for forty-five minutes at a time, stand for thirty
minutes at a time, and could sit or stand and walk for less than two hours in an eight-hour work
shift.  (Tr. 320.)  He further indicated that Vincent would need hourly unscheduled work breaks
and could lift and carry less than ten pounds occasionally, ten pounds rarely, and never any
heavier weight.  (Tr. 321.)  He also noted that Vincent could rarely stoop or climb stairs, and
could never twist, crouch, or climb ladders.  (Tr. 321.)  In responding to a question asking if
Vincent has significant limitations with reaching, handling, or fingering, Dr. Tatara checked the
space for "No," but then went on to indicate that Vincent could only use his hands to grasp, turn,

3

or twist objects and conduct fine finger manipulations twenty percent of the time during an eight-hour work day, and that he could reach his arms overhead only five percent of the time. (Tr. 321.)  He stated that these symptoms first appeared in 1999, and estimated that Vincent would likely be absent from work more than four days per month because of his impairments or treatments.  (Tr. 322.)

For the second hearing, Dr. Tatara submitted a letter dated February 23, 2006, writing that over the years, Vincent has developed joint pains, back pains, and "profound fatigue[,]" and that he was diagnosed with fibromyalgia, lumbar spinal stenosis, degenerative disk disease, osteoarthritis, morbid obesity, hypertension, depression, and iatrogenic constipation.  (Tr. 379.) He indicated that Vincent's symptoms began in 1999 and worsened until he could no longer work in 2001.  (Tr. 379.)  Dr. Tatara discussed the problematic side effects of Vincent's pain medications, reporting that he continues the pain treatments because the degenerative disk disease is irreversible and he has tried all treatments for fibromyalgia.  (Tr. 379.)

In his letter, Dr. Tatara also brought up his June 2004 questionnaire, discussing discrepancies that he explained "are likely due to [his] inattentiveness to the questions."  (Tr. 379.)  Dr. Tatara stated, "Clearly, he is incapable of maintaining even a sedentary job[,]" and that Vincent's pain persists despite the medication, he is unable to concentrate, and he is only out of bed for three to four hours twice a day.  (Tr. 379.)  He further reported that when Vincent tries to do housework, he is "wiped out" the next day as a result.  (Tr. 379.)  Dr. Tatara also stated that Vincent wakes up every hour or two because of his pain.  (Tr. 379.)  He then corrected his answer to one question, this time indicating that Vincent is incapable of even low stress jobs, and stated that Vincent is unable to sit for more than thirty minutes without having to get up.  (Tr.

379.)  Dr. Tatara also addressed the question about Vincent's limitations with reaching, handling, and fingering, this time elaborating that he cannot hold a pen longer than to write a brief note and that he has trouble holding books while reading.  (Tr. 379.)  He further reported that Vincent would not be able to complete a single day's work of more than four hours and would be in worse condition the following day.  (Tr. 379.)  Dr. Tatara stated that he believes "Vincent [is] unfortunately incapable of holding even the simplest job now and likely ever again."  (Tr. 379.)

### The Imaging Center, September and October 2001

Vincent was referred to the Imaging Center to undergo MRIs in September and October 2001.  (Tr. 141-43.)  An MRI of Vincent's spine revealed degenerative disk disease at L1-L2 and L5/S1, "very mild" degenerative disk canal stenosis at L1-L2 "not severe enough to be causing any neural compression[,]" and a small posterior bulge of the L5/S1 disk causing no neural impingement.  (Tr. 143.)  An MRI of Vincent's shoulders indicated moderate AC joint degenerative arthropathy, but was otherwise normal, and an MRI of his knees showed relatively mild bilateral patellofemoral joint compartment degenerative arthropathy and a metal foreign body in his lateral left knee.  (Tr. 141-42.)

### Dr. Joseph Fortin from October 18, 2001, to October 17, 2002

In October 2001, Dr. Tatara referred Vincent to Dr. Joseph D. Fortin, D.O., for a lumbar spine consultation.  (Tr. 227.)  After Vincent's first visit on October 18, 2001, Dr. Fortin's impression was that Vincent had lumbar degenerative disk disease, and he ruled out various other conditions.  (Tr. 226.)  Dr. Fortin prescribed Oxycontin and recommended following up in four weeks.  (Tr. 226.)  In November, he performed a series of three knee synvisc injections as a

result of Vincent's refractory right knee pain.  (Tr. 219-21.)

Electrodiagnostic studies of Vincent upper and lower extremities were performed in November and December 2001, which returned normal results.  (Tr. 215-18.)  Dr. Fortin also conducted lumbar discographies on Vincent in December, which mainly elicited no pain response (excepting one discordant and one negative pain response) and revealed some fissures. (Tr. 203-13.)  He conducted another in January, eliciting a negative pain response and revealing a fissure.  (Tr. 200-02.)  Dr. Fortin administered an injection to Vincent's back in January 2002, which resulted in "good relief," and then reexamined him in on February 8, 2002.  (Tr. 192-94, 196-97.)  His impression was that Vincent suffered from lumbar degenerative disk disease, lumbar stenosis, fibromyalgia, and he ruled out lumbar facet syndrome.  (Tr. 193.)  He recommended physical therapy, noted various pain management options, and continued Vincent's prescriptions, (Tr. 194), subsequently performing trigger joint injections in his left shoulder on February 15, 2002, (Tr. 191), which relieved Vincent's symptoms, (Tr. 188).  He then conducted an MRI on Vincent's left shoulder, with "mildly abnormal" results.  (Tr. 146.)

Vincent visited Dr. Fortin again on March 11, 2002, and after an examination, Dr. Fortin's impressions were bilateral knee osteoarthritis, lumbar degenerative disk disease, left shoulder osteoarthritis, lumbar stenosis, and he ruled out fibromyalgia as well as lumbar facet syndrome.  (Tr. 189.)  Dr. Fortin again noted pain management options and other treatments, and adjusted Vincent's medications.  (Tr. 190.)

In October 2002, Dr. Fortin submitted a statement about Vincent's ability to do work-related activities to the Disability Determination Bureau, and diagnosing right hip and testicular pain.  (Tr. 187.)  He estimated that Vincent could not sit for more than twenty minutes without

6

changing positions, could not stand for more than twenty minutes without resting, could not lift

more than five pounds, and that he was limited in his ability to walk, carry, and travel.  (Tr. 187.)


**Dr. David Campbell, June 2002 Evaluation**

Dr. Tatara referred Vincent to Dr. David Campbell, a rheumatologist, in June 2002.  (Tr.

164.)  Dr. Campbell noted Vincent's "incredibly advanced osteoarthritis as well as degenerative

disk disease."  (Tr. 164.)  His assessment was fibromyalgia, osteoarthritis, mild degenerative

disk disease, tobaccoism, hypertension, and sigmold diverticulae.  (Tr. 165.)  Among his

recommendations were aerobic exercise, physical therapy and that Vincent stop smoking to help

with the fibromyalgia.  (Tr. 165.)

**Dr. Gaddy's December 2002 Residual Functional Capacity Assessment,
Affirmed September 2003**

Dr. Gaddy, a state agency physician, reviewed Vincent's record in December 2002 and

concluded that Vincent could occasionally lift or carry ten pounds; frequently lift or carry less

than ten pounds; stand or walk for at least two hours in an eight-hour workday; sit for six hours

in an eight-hour workday; push or pull without limits; never climb ladders, ropes, or scaffolds;

and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps.  (Tr. 229-30.)  Dr.

Gaddy listed the evidence supporting his conclusion: fibromyalgia with multiple trigger points,

x-rays revealed minimal patellar femoral arthritis, minimal DJD, normal gait and station,

negative straight leg raising test, and that physical therapy documented Vincent's ability to

perform activities of daily living.  (Tr. 229.)  He noted that Vincent was partially credible but

that his complaints appeared excessive compared to the medical evidence, and that the medical

evidence is consistent with the residual functional capacity filed.  (Tr. 233.)  Dr. Lopez, the other

state agency physician, affirmed this assessment in September 2003.  (Tr. 235.)

### Dr. Stephen J. Hatch Consultative Examination, April 8, 2003 and May 20, 2003

Dr. Stephen J. Hatch, M.D., conducted a consultative exam on Vincent on April 8, 2003, for pain management options.  (Tr. 306-08.)  His assessment was fibromyalgia, and he determined that the management options were "extremely limited."  (Tr. 307.)  Dr. Hatch recommended temporarily increasing Vincent's pain medications, but believed no other treatment or invasive procedures would benefit him.  (Tr. 307.)  They met again for a follow-up exam on May 20, 2003, and Dr. Hatch's assessment was chronic musculoskeletal pain with fibromyalgia and arthritis most notably in the knees.  (Tr. 304.)  He viewed Vincent at maximum medical improvement and increased his pain medication.  (Tr. 304.)  He also suggested switching to a different medication, but concluded that he had no other advice to offer.  (Tr. 305.)

### Dr. Mark Reecer, January 2004 to March 2004

Dr. Tatara referred Vincent to Mark Reecer, M.D., for chronic pain on January 15, 2004.  (Tr. 312.)  His impression was that Vincent had fibromyalgia, and recommended that Vincent try a thirty day trial of a TENS unit for pain management.  (Tr. 314.)  Dr. Reecer also discussed with Vincent other medication options.  (Tr. 314.)  Vincent followed-up with Dr. Reecer on March 10, 2004, and continued to complain that the medications were not helpful and that he still had trouble sleeping.  (Tr. 310.)  Dr. Reecer noted spinal and muscular tenderness.  (Tr. 310.)  Although Dr. Reecer suggested another medication, Vincent rejected the idea because it had given him problems in the past.  (Tr. 310.)  Dr. Reecer concluded that they had exhausted conservative treatment options and decided to refer Vincent to the Mayo Clinic.  (Tr. 310.)

8

**Dr. Matthew Bunyard, November 12, 2004, Examination**

Dr. Tatara next referred Vincent to Matthew Bunyard, M.D., F.A.C.R., at the Cleveland

Clinic on November 12, 2004.  (Tr. 347.)  Dr. Bunyard's impression was that Vincent had a

longstanding history of a chronic musculoskeletal pain syndrome consistent with fibromyalgia,

and that this was the primary cause of his pain, although his osteoarthritis may contribute

somewhat.  (Tr. 349.)  Dr. Bunyard noted that Vincent requires high dosages of narcotics to help

his symptoms but they are not entirely effective, and that he has been through many other pain

management modalities without significant benefit.  (Tr. 349.)   He stated that he did not believe

that there was any further treatment to recommend.  (Tr. 349.)  He conducted laboratory tests on

Vincent which returned normal results, as well as a bone scan that showed only some mild

osteoarthritic changes and no evidence of other bone diseases.  (Tr. 345-46.)

*C.  Summary of February 28, 2006, Hearing Testimony*

Vincent testified that he is "in constant pain," that he hurts when he either sits or stands

after "very short periods," and that his hands hurt so much that it is hard for him to write more

than a note.  (Tr. 430.)  Vincent described his various treatments and discussed the effects of his

medication, stating that it "knocks the edge off" the pain but he continues to have it all the time

regardless.  (Tr. 430-35.)  He also indicated that he is tired all the time, which may be partially as

a result of his medication.  (Tr. 435.)  Vincent testified that he has constant "achy pain" which is

worst in his knees, his back, and his hands, but he sometimes has pain in his shoulders and neck

as well.  (Tr. 441-42.)  He stated that he believes activity aggravates his pain.  (Tr. 442.)

Vincent testified that is able to bathe, groom, and dress himself.  (Tr. 438.)  He explained

that he helps with the housework by loading a few dishes in the dishwasher or doing a load of

laundry, preparing a light dinner, and walking the dog, although he cannot vacuum.  (Tr. 437-38.)  Vincent estimated that he could probably lift about fifty pounds one time, and that he goes grocery shopping sometimes, carrying a bag of groceries of about ten pounds.  (Tr. 443.)  He further testified that in an eight-hour period, he could walk or stand for about an hour and a half, and that he could sit for three and a half or four hours.  (Tr. 443.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4]  *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[4]Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 404.1520(e).

Commissioner.  *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

The ALJ rendered his decision on July 21, 2006.  (Tr. 12-26.)  At step one of the five step analysis, he found that Vincent had not engaged in any substantial gainful activity since his alleged onset date and at step two that Vincent had severe impairments of chronic pain syndrome, fibromyalgia, osteoarthritis, obesity, degenerative disk disease, spinal stenosis, hypertension, cognitive disorder, and depression.  (Tr. 16.)  At step three, the ALJ determined that Vincent's impairments did not meet or equal a listing.  (Tr. 16-17.)

In proceeding to step four, the ALJ found that Vincent has the following RFC:

[T]he claimant has the residual functional capacity to perform a restricted range of sedentary work activity.  The claimant can lift and carry ten pounds occasionally and less than ten pounds frequently.  The claimant can sit for six hours during an eight-hour workday and stand/walk for two hours during an eight-hour workday.  The claimant must be able to sit/stand as needed.  He can never climb ladders, ropes, or scaffolds, and he can occasionally climb ramps and stairs.  He can occasionally balance, stoop, kneel, crouch, and crawl.  He is limited to performing simple, repetitive tasks.

(Tr. 17.)  In reaching this conclusion, the ALJ found Vincent's statements about the intensity, persistence, and limiting effects of his symptoms "not entirely credible."  (Tr. 18.)  Based on this RFC and the VE's testimony, he concluded at step four that Vincent was unable to perform his past relevant work.  (Tr. 25.)  At step five, however, the ALJ found that Vincent could perform a significant number of jobs within the national economy, including semi-conductor bonder, wafer breaker, and dies loader.  (Tr. 25-26.)  Thus, Vincent's claim for DIB was denied.  (Tr. 26.)

### C.  The ALJ Properly Evaluated the Opinion of Dr. Tatara, Vincent's Treating Physician

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and

circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, "[a] claimant is not entitled to DIB simply because his treating physician states that he is 'unable to work' or 'disabled,'" *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id*.; *Diaz*, 55 F.3d at 306 n.2; *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also* 20 C.F.R. § 404.1527(e)(3); *Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006). "Nonetheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8. "In evaluating the opinions of medical sources on issues reserved to the Commissioner,

the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) . . . ."  SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.

Vincent argues that the ALJ erred in evaluating the opinion of Dr. Tatara, his treating physician.  (Opening Br. 16.)  Ultimately, however, substantial evidence supports the ALJ's determination.

In assigning Dr. Tatara's opinion "limited weight," the ALJ specifically reasoned:

> The claimant's attorney has argued that the prior residual functional capacity determined by the prior [ALJ] was not consistent with the opinions of the claimant's treating physicians who found the claimant to be disabled.  However, two of these assessments are from the claimant's family doctor, Dr. Tatara, who is not a specialist and who seems to be relying essentially on the subjective complaints of the claimant and the diagnoses given by the other doctors.  It is noted that although the claimant testified to and Dr. Tatara identified very severe hand limitations, there is minimal documentation of medical findings pertaining to the claimant's hands in the file.  The progress notes from Dr. Tatara simply do not support the type of limitations he identified in his most recent opinion statement.  Significantly, the progress notes from February 23, 2003 indicate that the claimant was about to leave on a cruise.  Records from June 7, 2005 indicate that the claimant hurt his hand while loading a computer in his car.  Treatment notes from November 23, 2005 reveal that the claimant recently went on a 10-day deer-hunting trip with his siblings and stayed in a cabin . . . . These activities are not consistent with the extreme limitations alleged by the claimant and reflected in Dr. Tatara's opinions.

(Tr. 23-24.)  The ALJ next went on to explain that he also discounted Dr. Fortin's opinion because he is not a specialist in Vincent's conditions, and the extreme limitations he suggests are not supported by the numerous physical examinations he conducted on Vincent or Vincent's activities discussed in his testimony.  (Tr. 24.)

The ALJ then continued, "[f]urther, the extreme limitations identified by Dr. Tatara and by Dr. Fortin are not supported by the specialists who examined the claimant at the Cleveland Clinic.  Dr. Bunyard, a rheumatologist, summarized all of the claimant's history of diagnostic

testing, none of which supports such extreme limitations." (Tr. 24.) The ALJ set forth the details of Dr. Bunyard's review of the medical records, much of which revealed mild conditions or normal test results.[5] He also discussed Dr. Bunyard's impressions that Vincent suffers from fibromyalgia and that it is unlikely anything else causes his pain. (Tr. 24.) The ALJ recited Bunyard's assessment that arthritis was not the cause per se, and that it "seemed unlikely that there was any inflammatory polyarthritis or connective tissue disease or that [Vincent] had any metabolic, endocrine, neoplastic, or infectious process as the cause of the symptoms." (Tr. 24.) He also mentioned Dr. Bunyard's recommendation that Vincent attempt an exercise program. (Tr. 24.) The ALJ concluded that Vincent's "limitations are not supported by the diagnostic testing evidence or by his activities. Therefore, limited weight can be given to his subjective allegations or to medical opinions that are based on his subjective complaints." (Tr. 24.)

Clearly, the ALJ pursued the proper analysis in according Dr. Tatara's opinion "limited weight," providing at least five grounds for discounting a treating physician's opinion, including various inconsistencies within Dr. Tatara's report as well as other probative medical evidence. *See* 20 C.F.R. § 404.1527(d)(2). Not to be deterred, however, Vincent advances six arguments that the ALJ erred in making his determination.

------

[5]Specifically, the ALJ stated:
Dr. Bunyard outlined that the claimant's bilateral knee x-rays of October 25, 2001 showed mild patella femoral joint narrowing; a September 19, 2001 MRI showed degenerative disc disease at L1-2, L5-S1 and a mild degree of degenerative spinal canal stenosis at L1-2 without neural impingement; an August 14, 2001 hip x-ray showed minimal degenerative change; sacrum and coccyx x-rays from September 12, 2003 were normal; an MRI on September 15, 2004, revealed broad-based bulging with small central extrusions at L1-2 with central canal and neural foraminal stenosis through multiple levels but which appeared to be mild; a September 15, 2004 CT of the brain was normal; September 15, 2004 knee x-rays were normal; a September 15, 2004 chest x-ray was negative[;] September 15, 2004 blood work revealed normal CBC, chemistries, TSH, C-reactive protein, B12 foliate with a negative ANA and rheumatoid factor.
(Tr. 24.)

**1.     The ALJ did not commit reversible error in considering Dr. Tatara's specialty.**

First, Vincent argues that the ALJ erred in stating that Dr. Tatara is not a specialist because he is in fact an internal medicine specialist, and that the state agency doctor's specialties of neurology and "other" give them no greater knowledge than Dr. Tatara's.  (Opening Br. 17-18.)  While the ALJ's statement that Dr. Tatara "is not a specialist[,]" (Tr. 23), does overlook his specialty in internal medicine, his statement is accurate to the extent that Dr. Tatara *is not a specialist in the field "most connected" with fibromyalgia*, rheumatology, as Vincent himself recognized in his brief, (Opening Br. 17), and therefore Dr. Tatara's specialty does not necessarily oblige the ALJ to assign his opinion more weight than that of the state agency doctors.  *See* 20 CFR § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  Consequently, the ALJ's error in failing to acknowledge Dr. Tatara's particular specialty is essentially harmless, *see Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."), and the Court will not accept Vincent's plea to merely re-weigh the evidence from the medical source opinions of record.  *See Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000) ("[T]his Court may not decide the facts anew, re-weigh the evidence or substitute its own judgment for that of the Commissioner . . . .").

**2.     The ALJ did not err in considering that Dr. Tatara heavily relied upon Vincent's subjective complaints.**

Vincent next maintains that the ALJ erred in finding that Dr. Tatara relied on Vincent's subjective complaints and the diagnoses of other doctors because the symptoms of fibromalgia

are subjective by nature, and Vincent's complaints of pain and problems sleeping are not mere symptoms but signs of fibromyalgia that the ALJ should have treated as objective medical evidence in assessing the weight of Dr. Tatara's opinion.  (Opening Br. 18.)  Vincent also asserts that the fact that all the other physicians also diagnosed him with fibromyalgia supports Dr. Tatara's opinion.  (Opening Br. 18.)

To begin, while fibromyalgia's symptoms are subjective and there are no laboratory tests to measure its presence or severity, *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996), it does not necessarily follow that the ALJ erred in considering the fact that Dr. Tatara heavily relied on Vincent's subjective complaints.  Indeed, *Sarchet* opines that while "some people may have such a severe case of fibromyalgia as to be totally disabled from working . . . most do not and the question is whether [the claimaint] is one of the minority."  *Id*. at 307.  Here, the ALJ pointed to the lack of medical findings concerning Vincent's hands, as well as activities that seemingly contradict Dr. Tatara's opinion that Vincent's symptoms have severely limiting effects; specifically, that he went on a cruise, loaded a computer in his car, and went on a ten-day hunting trip.  (Tr. 23-24.)  *See Powers*, 207 F.3d at 435 (stating in a case involving a claimant alleging fibromyalgia among her impairments, "[w]hile a hearing officer may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the officer may consider that as probative of the claimant's credibility") (citation omitted).  Moreover, Vincent's allegations of disability are premised upon more than fibromyalgia, but also spinal diseases and other afflictions, and when a medical source opinion is based upon the claimant's subjective report of symptoms, rather than medically acceptable clinical and laboratory diagnostic techniques, the ALJ does not err in discounting it.  *See* SSR 96-2p; *White*

*v. Barnhart*, 415 F.3d 654, 658-59 (7th Cir. 2005) (discounting a treating physician's opinion because it was based on the claimant's subjective complaints); *Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000) (discounting a treating physician's opinion because it was largely based upon the claimant's subjective complaints which were inconsistent with the evidence as a whole).

Furthermore, "[i]t is well settled that an administrative law judge may properly disregard a medical opinion when it is premised on the claimant's self-reported symptoms and the administrative law judge has reasons to doubt the claimant's credibility." *Valla v. Astrue*, No. 3:07-cv-370-bbc, 2008 U.S. Dist. LEXIS 10115, at *37-39 (W.D. Wis. Feb. 8, 2008) (citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1989); *Mastro v. Apfel*, 270 F.3d 171, 177-78 (4th Cir. 2001); *Morgan v. Comm'r of the Social Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)). Having found Vincent's subjective allegations "not entirely credible," a determination that we affirm *infra*, the ALJ then chose to discount Dr. Tatara's proffered restrictions, such as Vincent's severe limitiations on working with his hands. Thus, the ALJ's rationale concerning his RFC determination is easily traced in this instance. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)).

To analyze Vincent's argument that his subjective complaints are essentially transformed into objective medical evidence with the diagnosis of fibromyalgia, it is necessary to understand the evaluation of subjective symptoms, such as pain, in a disability determination. Vincent cites to SSR 96-4p, which provides:

> No symptom or combination of symptoms by itself can constitute a medically determinable impairment. In claims in which there are no medical signs or

> laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, *the individual must be found not disabled at step 2* of the sequential evaluation process . . . .

SSR 96-4p (emphasis added).  When subjective symptoms such as pain and fatigue "can be shown by medically acceptable clinical diagnostic techniques," they are deemed to be medical "signs" that can support a finding of fibromyalgia as a severe impairment at step two.  *See* SSR 96-4p n.2.  Here, the ALJ never questioned Dr. Tatara's diagnosis of fibromyalgia, since he found that it was a severe impairment at step two.

Instead, the ALJ questions Dr. Tatara's reliance on Vincent's subjective complaints of pain in evaluating what weight to give his opinion.  Nothing in SSR 96-4p mandates that an ALJ must entirely accept a claimant's allegations regarding that severity of his complaints as objective medical "signs."  Indeed, if an ALJ were forced to accept the claimant's allegations as objective evidence, then a credibility determination would be unnecessary, and a claimant with fibromyalgia would essentially be guaranteed a finding of disability based merely on the fact that he complained to his physician that his symptoms were severe.  Such a conclusion runs contrary to Seventh Circuit case law.  *See Powers*, 207 F.3d at 435 (finding an ALJ's credibility determination was supported by substantial evidence because the "ALJ found that Powers did indeed suffer some pain from her [fibromyalgia], but that the medical evidence did not support the extent of pain to which she complained"); *Sarchet*, 78 F.3d at 307 (opining that in most cases fibromyalgia is not disabling); SSR 96-7p ("Once the existence of a medically determinable physical . . . impairment[] that could reasonably be expected to produce pain or other symptoms has been established, adjudicators must recognize that individuals may experience their

symptoms differently and may be limited by their symptoms to a greater or lesser extent . . . .").[6]

Therefore, the ALJ did not did not err in considering Dr. Tatara's reliance on Vincent's

subjective complaints.[7]

**3.    The ALJ did not err in considering the lack of evidence supporting Dr. Tatara's severe limitations on Vincent's ability to use his hands.**

Vincent also maintains that the ALJ erred in finding the medical evidence on Vincent's

hand limitations minimal because Dr. Tatara did refer to Vincent's hand problems in his notes.

(Opening Br. 18-19.)  He further argues that the lack of medical evidence was an inappropriate

reason for discounting the weight of Dr. Tatara's opinion because the limitation "is not critical to

the case as either a limitation to part-time work or the absenteeism is enough for a finding of

disability."  (Opening Br. 19.)

Vincent's argument regarding the ALJ's finding of minimal documentation of medical

findings substantiating Dr. Tatara's hand limitations must fail.  Vincent points to only two places

in the lengthy record of Dr. Tatara's progress notes where he was treated for problems with his

hands, and those short notations pertaining to hand pain amount to two phrases: "Hands/finger

hurt to hold a book[,]" (Tr. 269), and "arthralgia hands [,]"[8] (Tr. 272).  Highlighting these two

brief references to Vincent's hand problems hardly contradicts the ALJ's finding that their

---

[6]Vincent's assertion that the other physicians' diagnoses of fibromyalgia supports Dr. Tatara's opinion similarly fails to demonstrate that the ALJ erred, as the ALJ indeed found at step two that Vincent had fibromyalgia and that it was a severe impairment.  Thus, that other physicians agreed that he has fibromyalgia does not impact the ALJ's finding as to credibility of Vincent's subjective complaints, and in turn, Dr. Tatara's reliance upon them.

[7]Moreover, the ALJ discounted Dr. Tatara's opinion because he relied "essentially on the subjective complaints of the claimant *and* the diagnoses given by the other doctors."  (Tr. 23 (emphasis added).)  Therefore, the ALJ took issue not only with the subjectivity of Vincent's complaints, but also Dr. Tatara's heavy reliance on other doctors' opinions, one of whom, Dr. Fortin, the ALJ pointed out was not a specialist in the relevant area and that his extreme limitations were inconsistent with his numerous examination notes and Vincent's testimony about his activities.

[8]Two indecipherable handwritten words also follow the note "arthalgia hands[.]"

documentation was minimal in contrast to the severe limitations Dr. Tatara recommended, and essentially amounts to a nitpicking of the ALJ's word choice. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it").

Moreover, Vincent's assertion that the evidence on the hand limitations is irrelevant to the finding of disability is misplaced. Here, the ALJ is *not* considering the weight to give the hand limitations in making the disability determination. Rather, the ALJ is *evaluating the weight to give Dr. Tatara's opinion*, and whether medical evidence supports Dr. Tatara's recommendations is probative of what weight to assign it. *See* SSR 96-2p ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.")

**4.     The ALJ properly considered Vincent's activities in discounting Dr. Tatara's opinion.**

Vincent also claims that "the ALJ improperly relie[d] upon isolated and non-specific progress notes to reduce the weight of the opinion" when he pointed to inconsistencies between Vincent's activities and Dr. Tatara's severe limitations; namely, that Vincent went on a cruise and a ten day hunting trip and that he hurt his hand carrying a computer. (Opening Br. 19.) However, the ALJ permissibly highlighted an obvious inconsistency between the Dr. Tatara's severe limitations and substantial evidence of Vincent's activities. *See* SSR 96-2p (explaining that a treating source's opinion must not be inconsistent with other substantial evidence to be given controlling weight, and that an "obvious inconsistency" exists "when a treating source's report contains an opinion that the individual is significantly limited in the ability to do work-related activities, but the opinion is inconsistent with the statements . . . about the

21

individual's actual activities").

Nonetheless, Vincent argues that the activities themselves are not necessarily inconsistent with Dr. Tatara's limitations, since Vincent asked for extra pain medication for his cruise, may not have actually hunted much on his hunting excursion, and may have carried a computer that was ten pounds or less.  Although the ALJ did not specifically consider that Vincent asked for more medication when embarking on his cruise, the ALJ thoroughly considered the medical record as a whole, composing five pages reciting and analyzing it, and an ALJ "need not provide a written evaluation of every piece of evidence that is presented," *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), as long as the reviewing court is "able to trace the ALJ's path of reasoning."  *Books*, 91 F.3d at 980.  Here, the ALJ's path is easily traced, as he could reasonably conclude that engaging in vigorous or involved activities (with additional medication or not), such as taking distant or lengthy excursions or carrying potentially heavy objects, runs counter to Dr. Tatara's extreme statements that Vincent "cannot hold a pen to write more than a brief note" and cannot even read a paperback without hand pain.  (Tr. 379.)  *See, e.g., Scott v. Sullivan*, 898 F.2d 519, 524 n.6 (7th Cir. 1990) (finding that the claimant's ability to go hunting and fishing, among other activities, further supported the ALJ's determination that his severe impairment did not preclude him from doing light or sedentary work).

**5.     The ALJ properly analyzed the 20 C.F.R. § 404.1527(d) factors in assigning "limited weight" to Dr. Tatara's opinion.**

Vincent further argues that the ALJ did not adequately discuss the appropriate factors in discounting Dr. Tatara's opinion; specifically, the factors of length and frequency of the treatment relationship.

Contrary to Vincent's view, the ALJ thoroughly explored the various factors.  With

regard to his consideration of the length and frequency of the relationship, *see* 20 C.F.R. §
404.1527(d)(2)(i), the opinion contains multiple references to its ongoing nature, indicating that
he did indeed consider this factor.  For example, the ALJ *explicitly refers* to Dr. Tatara as
Vincent's "[l]ongtime treating physician[,]" (Tr. 20), and later notes that in his February 23,
2003, letter, Dr. Tatara "explained that he has been the treating physician for the claimant since
October 1990."  (Tr. 21.)  Furthermore, the ALJ considered the nature and extent of the
relationship, *see* 20 C.F.R. § 404.1527(d)(2)(ii), in his summary of Dr. Tatara's letter setting
forth Vincent's various treatments, diagnoses, and overall medical history throughout the years,
penning nearly an entire page describing that letter alone.  (Tr. 21-22.)  That the ALJ
contemplated the extent and nature of their treatment relationship is further evidenced by the fact
that he explicitly noted that Dr. Tatara was responsible for referring Vincent to the various
specialists, Dr. Fortin, Dr. Campbell, Dr. Hatch, Dr. Reecer, and Dr. Bunyard.  (Tr. 20-21.)  *See*
20 C.F.R. § 404.1527(d)(2)(ii) ("We will look at the treatment the source has provided and at the
kinds and extent of examinations and testing the source has performed or ordered from
specialists and independent laboratories.").

Undaunted, Vincent alleges that the ALJ did not explain why the longtime treating
relationship did not accord his opinion more weight.  However, the ALJ thoroughly explored
other factors – how much supporting evidence is provided , *see* 20 C.F.R. § 404.1527(d)(3), the
consistency between the opinion and the record as a whole, *see* 20 C.F.R. § 404.1527(d)(4), and
whether the treating physician is a specialist, *see* 20 C.F. R. § 404.1527(d)(5)  – and how those
factors diminished the weight of Dr. Tatara's opinion.  *See Berger v. Astrue*, 2008 U.S. App.
LEXIS 2807, at *17 (7th Cir. 2008) (finding the ALJ did not error in discounting the opinions of

the claimant's longtime physician and a physician who was a specialist because he "showed that he was aware of the roles these doctors played in [the claimaint's] treatment, [and] he nonetheless decided to discount their medical opinions" for other reasons).

As previously discussed, the ALJ addressed the amount of evidence supporting Dr. Tatara's opinion, highlighting the "minimal documentation of medical findings" on Vincent's hand pain and the inconsistency of Vincent's activities with the severe limitations Dr. Tatara imposed. (Tr. 23-24.)  *See* 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").  Furthermore, as discussed *supra*, the ALJ highlighted that Dr. Tatara is not a specialist in the realm of the relevant illnesses, which Vincent conceded. (Tr. 23; Opening Br. 17.)  *See* 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Moreover, the ALJ also identified inconsistencies between Dr. Tatara's recommendations and the findings of Dr. Bunyard of the Cleveland Clinic, penning a lengthy paragraph (comprising nearly half a page) describing Dr. Bunyard's review of the battery of Vincent's past tests indicating normal results or mild conditions; his impressions that the cause was likely not any inflammatory polyarthritis or connective tissue disease or metabolic, endocrine, neoplastic, or infectious process; and his suggestion that Vincent try aerobic exercise.[9]  (Tr. 24.)  *See* 20

---

[9]Vincent also argued that the ALJ did not adequately explain the inconsistencies between Dr. Tatara's and Dr. Bunyard's opinions, reasoning that since Dr. Bunyard did not provide any functional limitations, an inconsistency is not evident.  (Opening Br. 19-20; Reply Br. 3-4.)  Dr. Bunyard, however, did provide the comprehensive summary of the various test results described above, and their normal results or indications of mild conditions, along with his suggestion that Vincent engage in aerobic exercise, could reasonably be considered inconsistent with Dr. Tatara's recommendation of severe physical limitations.

C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  Thus, contrary to Vincent's assertion, the ALJ *did* explain how the other factors led to assigning Dr. Tatara's opinion "limited weight."[10]

### D.  The ALJ's Credibility Determination Will Not Be Disturbed

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference.  *Powers*, 207 F.3d at 435.  If an ALJ's determination is grounded in the record, and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge from the evidence to [the] conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal quotation and citation omitted), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ first described Vincent's hearing testimony, including statements about his daily activities and the effects of his impairments and medications on his life.  (Tr. 17-18.)  The ALJ found that Vincent's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [his] statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  (Tr. 18.)  He explained that he

---

[10]Vincent also alleges an argument about Dr. Tatara's findings on Vincent's obesity, but how this relates to the factors the ALJ should consider in weighing Dr. Tatara's opinion is unclear.  (Opening Br. 20.)  In any event, the argument is not persuasive, as the ALJ found at step two that Vincent's obesity was a severe impairment, specifically noted Dr. Tatara's diagnosis of morbid obesity, (Tr. 16, 22), and otherwise provided adequate reasons to discount Dr. Tatara's opinion, as discussed *supra*.

evaluated Vincent's complaints per Social Security Ruling 99-2p and found that the objective medical evidence did not fully substantiate them because the majority of the medical evidence included findings of mild conditions inconsistent with his subjective complaints of disabling pain.  (Tr. 18-19.)  He then engaged in a lengthy narrative of Vincent's medical history, including the results of his MRIs from 2001 and 2002 and the opinions of Dr. Fortin, Dr. Campbell, Dr. Hatch, Dr. Reecer, Dr. Bunyard, Dr. Tatara, and the state agency doctors.  (Tr. 20-23.)

Next, the ALJ provided no less than four reasons supporting his credibility determination: that Dr. Campbell's and Dr. Bunyard's recommendations that he perform aerobic exercise indicate that Vincent is capable of walking and standing; that his medications have never been significantly changed, indicating that the side effects are "tolerable;" that Vincent's treatment remained conservative and when he did undergo more aggressive measures he experienced relief; and that Dr. Fortin's medical findings did not support Vincent's allegations of complete incapacity.  (Tr. 23.)  Thus, the ALJ provided a detailed and specific list of reasons for dashing Vincent's credibility on the basis that his alleged limitations exceed medical substantiation.  *See* SSR 96-7p ("The determination . . . must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."); *Powers*, 207 F.3d at 435 (finding an ALJ's credibility determination was supported by substantial evidence because the "ALJ found that Powers did indeed suffer some pain from her [fibromyalgia], but that the medical evidence did not support the extent of pain to which she complained").

26

Despite the ALJ's thorough evaluation, Vincent contends that the ALJ improperly evaluated his credibility.  Vincent's arguments, however, do not hold up.  First, Vincent asserts that the ALJ does not explain how the doctors' recommendations regarding aerobic exercise are inconsistent with Vincent's testimony that he could stand for an hour and a half in an eight-hour day.  (Opening Br. 22.)  Vincent's assertion is to no avail, because the ALJ is not reasoning that the recommendation of aerobic exercise is inconsistent specifically with Vincent's testimony about standing, but rather that "it is consistent to with the ability to do some walking and standing," (Tr. 23), which is in conflict with Vincent's allegations of severe limitations on his ability to work.  The ALJ's reasoning created "an accurate and logical bridge from the evidence to [his] conclusion, *Dixon*, 270 F.3d at 1176, that Vincent is "*not entirely* credible," crediting Vincent's symptoms but simply not all of his assertions as to their severity.

Vincent also challenges the ALJ's conclusion that Vincent's alleged limitations are more severe than warranted based on a plethora of diagnostic testing, asserting that there are no laboratory tests to indicate the presence or severity of fibromyalgia.  (Opening Br. 22.)  While Vincent's statement about the capability to test for fibromyalgia is true, *see Sarchet*, 78 F.3d at 306, his argument overlooks two important points.

To elaborate, Vincent ignores the fact that his claim for disability is not based solely on fibromyalgia, but also on other impairments, such as his back problems.  In fact, within his credibility analysis, the ALJ points out that "Dr. Fortin's examinations generally showed minimal medical findings[,]" and listed Dr. Fortin's observations that Vincent's appearance, behavior, coordination, and sensation and reflexes were all appropriate or normal; that his lumbar, shoulder, and hip were only mildly restricted; and that the strength and tone of his lower

27

extremities was within functional limits; but also that Vincent did have tenderness and tender

points.  (Tr. 23.)  The ALJ then determined that "while the claimant's pain, tenderness, and

tender points may limit him to a restricted range of sedentary work that allows for a sit/stand

option, there is not sufficient evidence that his symptoms from his severe *impairments* would be

*completely* incapacitating."  (Tr. 23 (emphasis added).)  Thus, the ALJ's finding regarding the

diagnostic testing goes more to Vincent's *other impairments*, as he actually did credit Dr.

Fortin's findings on tenderness and pain from the fibromyalgia and took it into account when

restricting him to only sedentary work with a sit/stand option.  (Tr. 23.)

Vincent also overlooks that the ALJ did *not* state that he based his determination that his

limitations are more severe than warranted *solely* on the diagnostic testing, but also on Vincent's

activities as well as the findings of the specialists at the Cleveland Clinic, (Tr. 23), reasons he

fleshes out further on in the opinion.  Consequently, the ALJ's finding that the Vincent's

allegations of severe limitations are unwarranted is not so lightly supported as Vincent portrays.

Vincent next takes issue with the ALJ's statement that there is insufficient evidence that

his symptoms would be "completely incapacitating[,]" (Opening Br. 23; Tr. 23), maintaining that

the ALJ is mistakenly demanding Vincent to prove that he is "completely incapacitated," a

higher burden of proof than Vincent is required to meet, (Opening Br. 23).  The

misunderstanding, however, is Vincent's, and his contention therefore misses the mark.  The

ALJ is not requiring Vincent to show he is "completely incapacitated;" rather, the ALJ is simply

stating that the evidence is insufficient to substantiate *Vincent's* allegations that he is completely

incapacitated, or severely limited in his ability to work, which relates to the ALJ's credibility

determination.

Vincent lastly objects to the ALJ's reasoning that his treatment has been conservative and he experienced relief from treatments other than medication. (Opening Br. 24.) Vincent asserts fibromyalgia treatment is generally conservative in nature, that the pain relief is transitory, and that Vincent exhausted his treatment options. As previously noted, however, Vincent is not merely asserting that he is disabled because of fibromyalgia. Furthermore, SSR 96-7p lists the type of treatment that a claimant receives as an appropriate factor to consider when rendering a credibility determination, and nothing in this Ruling provides an exception for fibromyalgia. Moreover, to further support his reasoning that more aggressive measures were helpful, the ALJ pointed to the injections from Dr. Fortin that did successfully provide pain relief, and the ALJ's credibility assessment must stand "'as long as [there is] some support in the record,'" *Berger*, 2008 U.S. App. LEXIS 2807, at *18 (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). Accordingly, there is nothing "patently wrong" with the ALJ's decision to discredit Vincent based on the lack of more aggressive treatment. *See Miller v. Astrue*, No. 05-4409, 2007 WL 1452966, at *2 (8th Cir. May 18, 2007) (determining that the ALJ properly discounted the claimant's assertion that she was unable to work because of fibromyalgia and back pain because the ALJ's finding was supported by the lack of aggressive medical treatment).[11]

---

[11]Vincent also resurrected his earlier objection to the ALJ's finding that Dr. Bunyard's records are inconsistent with Vincent's allegations, but for the same reasons articulated *supra*, note 7, his contention is meritless. He also attacked the ALJ's reasoning that his side-effects from his medications must be tolerable since his medications have never been significantly changed or adjusted. (Opening Br. 23.) Vincent contends that the ALJ's statement is inaccurate because his medications have been adjusted, and the ALJ inappropriately discredited him on this basis because he must continue to take them for pain relief. However, the ALJ does not find that Vincent's medications have not been adjusted at all, but rather that they have not been *significantly* changed or adjusted, suggesting that their benefits must outweigh their problems and that they may not as debilitating as Vincent contends. Vincent does not show how this reasoning is "patently wrong . . . or divorced from the facts contained in the record[,]" *Berger*, 2008 U.S. App. LEXIS 2807, at *19 (internal quotation marks and citation omitted), and indeed, the ALJ is entitled to consider a claimant's treatment history as part of his credibility analysis, *see* SSR 96-7p.

In sum, the ALJ did not fully discredit Vincent; he merely found his statements regarding the severity of his symptoms not entirely credible, providing reasons to support that notion. "This court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding[,]" *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004) (citations omitted), as the ALJ has done here.  Ultimately, Vincent's arguments amount to mere nitpicking at the ALJ's decision.  *See Rice*, 384 F. 3d at 369 (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it") (internal quotation marks and citations omitted).  Accordingly, the credibility determination will not be disturbed.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Vincent.

SO ORDERED.

Enter for this 3rd day of March, 2008.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge